EVERETT SALVAIL, Plaintiff and Respondent, v. GREAT NORTHERN RAILWAY COMPANY, a Corporation, Defendant and Appellant.

No. 11789.
Decided Aug. 10, 1970.
Rehearing Denied Sept. 9, 1970
473 P.2d 549.

14

H. D. Carmichael, Butte, Gough, Booth, Shanahan & Johnson, Helena, for appellant.

Burgess, Joyce, Prothero & Whelan, Butte, for respondent.

MR. JUSTICE HASWELL delivered the Opinion of the Court.

This is a personal injury action by a railroad employee against the railroad for damages under the Federal Employers' Liability Act. A jury in the district court of Silver Bow County, the Hon. James D. Freebourn, district judge presiding, returned a verdict in favor of plaintiff employee for $125,000 and judgment was entered thereon. From this final judgment, defendant railroad appeals.

Plaintiff is Everett Salvail who was employed by defendant Great Northern Railway Company as a freight checker in Butte, Montana. His duties were generally to assist in loading and unloading freight that had been, and was intended to be, shipped in interstate commerce and to check it for quantity and possible damage. The Dahlman Transfer Business in Butte had a contract with defendant railroad to perform local pickup and delivery service of less than carload quantities of freight, both inbound and outbound, that were being shipped on defendant railroad. Plaintiff's duties of employment required him to go out with the driver of the Dahlman Transfer Business in connection with the pickup and delivery of such freight on the day of the accident.

On February 7, 1968, trailer 404 of defendant railroad arrived in Butte and contained three large shipments of less than carload quantities of freight to be delivered respectively to three Butte businesses: F. E. Buck Sales; Treasure State Gas and Electric; and Montana Hardware. The tractor of Dahlman Transfer, driven by a Dahlman driver Frank Sikonia, was coupled to Great Northern trailer 404 to make these deliveries with plaintiff accompanying Sikonia.

Just prior to the accident in question, Sikonia had made a pickup of some mattresses at one warehouse of the F E. Buck

16

Sales and 16 pieces of furniture from another Buck warehouse. The pickup of this freight was entirely under the direction of Sikonia.

In order to load the furniture from the second Buck warehouse, Sikonia had moved the tractor and trailer outfit so that the rear of the trailer was approximately even with the loading dock and generally parallel with and several feet south of the warehouse. The furniture was loaded on the rear end of the Great Northern trailer with some of it blocking the trailer doors so that they could not be closed.

A truck owned by Ossello Furniture Company drove into the warehouse area from the east for the purpose of making a pickup at the other Buck warehouse but its way was blocked by the Dahlman outfit. At that time there was also a Northern Pacific Transport truck stopped several feet behind and to the north of the Dahlman outfit. This Northern Pacific truck was waiting for the Dahlman outfit to complete its pickup at the second Buck warehouse so it could make a pickup there.

At this time plaintiff Salvail was in the Great Northern trailer engaged in moving the furniture forward. Sikonia told him he was going to the cab of the Dahlman tractor to start the engine to build up air for operation of the brakes. At this point, the testimony becomes conflicting. Plaintiff Salvail denies any knowledge or warning by Sikonia that the Great Northern trailer was going to be moved back in order to let the Ossello truck through. Sikonia testified he told plaintiff he was going to move back, in order to let the Ossello truck through. The driver of the Northern Pacific truck heard Sikonia, who was standing between the rear of the Great Northern trailer and the front of the Northern Pacific truck, say to somebody that he was going to get out of Ossello's way so that they could get through.

In any event, Sikonia backed the outfit out very slowly. The Northern Pacific driver testified he honked when Sikonia got close to his outfit and that Sikonia then stopped. The Ossello driver heard this honk. Both Sikonia and plaintiff testified

they did not hear the honk. The rear end of the Great Northern outfit cleared the cab of the Northern Pacific truck but struck the rear end. Air brakes on the Great Northern outfit were applied and it came to a stop. The impact between the Great Northern outfit and the Northern Pacific was slight.

When the Great Northern trailer in which he was working started moving backward, plaintiff moved to the rear of the trailer where a mirror in a cardboard carton was standing in an upright position and extending some six or eight inches beyond the end of the trailer; his purpose was to prevent damage to the mirror by moving it forward into the trailer. In the process he was propelled out the back of the trailer through its open doors, striking the icy and rutted roadway and sustaining the injuries to his right foot that form the basis of the instant action.

Plaintiff's injury consisted of a crushing fracture of his right heel bone. Following hospitalization and medical treatment, he attempted to return to work on his physician's advice in August 1968 and was able to work a total of six weeks and one day in August, September and October. Finally he was unable to work any longer, took additional medical treatment, and in December submitted to surgery consisting of triple arthrodesis of the ankle. The purpose of this operation was to fuse four bones and three joints in his foot to eliminate mobility and its resulting pain. Plaintiff has never worked since.

Plaintiff filed the instant suit on January 29, 1969. Discovery was had and a pretrial order was entered superseding the pleadings. Essentially plaintiff contended that the Dahlman driver was negligent and that such negligence was imputed to the railroad as the Dahlman driver was furthering its operational activities making him the railroad's agent under the Federal Employers' Liability Act. Additionally, plaintiff claimed the railroad was negligent in failing to furnish him a safe place to work. Because of such negligence, plaintiff was permanently injured and incurred general damages in the sum of $150,000, and special damages of about $9,500; according to plaintiff.

18

The defense, as disclosed by the pretrial order, consisted of a denial by the railroad of any negligence on its part coupled with a denial of liability for any acts or omissions of the Dahlman driver; a contention that plaintiff was not acting in the course and scope of his employment nor furthering interstate commerce at the time of his injury; and, a claim of contributory negligence on plaintiff's part entitling the railroad to diminution of damages to that extent.

The case came on for jury trial in the district court in Butte on June 16, 1969 before Judge Freebourn. At the conclusion of all the evidence, defendant moved for a directed verdict which the court denied. The case was submitted to the jury which returned a general verdict in favor of plaintiff Salvail against defendant Great Northern Railway Company in the amount of $125,000 and judgment was entered thereon. Following denial of defendant's motion for judgment notwithstanding the verdict or alternatively for a new trial, defendant appealed from the judgment.

The underlying issues for review upon appeal can be summarized in this manner: (1) Was there sufficient proof of any negligence chargeable against defendant railroad? (2) Did the court err in allowing plaintiff to examine the Dahlman driver as an adverse witness? (3) Did the court err in giving three jury instructions over defendant's objection? (4) Was the verdict excessive?

Defendant's initial attack is directed at the sufficiency of the evidence to prove any negligence chargeable against it. Defendant contends there is no proof that defendant failed to furnish plaintiff a safe place to work or that Sikonia, the Dahlman driver, did not use reasonable care in operating the tractor-trailer unit. Defendant's major attack on this issue, however, is that the negligence of the Dahlman driver cannot be imputed to defendant railroad under the Federal Employers' Liability Act. Accordingly, defendant argues, there is a failure of proof that

plaintiff's injury was caused, in whole or in part, by the negligence of defendant railroad which requires the judgment to be reversed and plaintiff's action dismissed

We agree with defendant that there is insufficient proof in the instant case of any negligence on its part by reason of any failure to provide plaintiff with a safe place to work. We do not agree that there was a failure to prove negligence on the part of Sikonia, the Dahlman driver.

■ Viewing the evidence in the light most favorable to plaintiff, as we must where plaintiff prevails below, we find that Sikonia, knowing that plaintiff was inside the trailer moving furniture from the rear toward the front and knowing that the trailer's doors were open, proceeded without warning to back up the large, difficult-to-maneuver tractor-trailer unit in close quarters; struck the rear of the Northern Pacific truck parked behind; applied his air brakes; and propelled plaintiff through the open doors of the trailer onto the ground below. Under such circumstances might not a jury decide that the acts and omissions of Sikonia were not those of a reasonably prudent person under the circumstances thereby constituting negligence on his part? Of course they could, and the verdict reflects this finding!

However, the major thrust of defendaant's attack is that defendant railroad is not liable for any negligence of the Dahlman Transfer Business because the Dahlman Transfer Business is an independent contractor and not an agent of defendant railroad. Hence, the negligence of Sikonia, the Dahlman driver, cannot be imputed to defendant railroad, according to this argument, and the basis for liability on the part of the railroad fails.

In discussing this contention we will assume, arguendo, that the Dahlman Transfer Business is an independent contractor under its contract with the Great Northern Railway Company.

Section 51 of the Federal Employers' Liability Act, Title 45, Railroads, U.S.C.A., provides the basis for employer liability in the following language:

20

"Every common carrier by railroad while engaging in ([interstate or foreign] commerce * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce * * * for such injury * * * resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its [equipment] * * *".

From the foregoing quotation, it is clear that negligence chargeable to the employer is necessary before liability can attach under the Federal Employers' Liability Act. Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Hughes v. Great Northern Railroad Company, 154 Mont. 329, 462 P.2d 879. And, where a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are "agents" within the meaning of section 51 of the Federal Employers' Liability Act above noted, rendering the railroad liable for the negligence of the other's employees. Sinkler v. Missouri Railroad Company, 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed. 2d 799.

As we hold the *Sinkler* case and its rationale controlling in the instant case, further examination of that case appears appropriate. In *Sinkler*, plaintiff was employed by defendant railroad as a cook on the private car of defendant railroad's general manager. An independent corporation, free from detailed supervision of the defendant railroad, conducted all switching operations within the terminal area for defendant railroad under contract. Negligence on the part of its switching crew caused the private car of the railroad in which plaintiff was working to collide with another railroad car, thereby injuring plaintiff. The railroad was held liable for the negligence of the switching crew of the independent corporation.

The United States Supreme Court, speaking through Mr. Justice Brennan, held that under the Federal Employers' Lia-

bility Act a railroad is a unitary enterprise whose economic resources are obligated to bear the burden of all injuries befalling those engaged in the enterprise arising out of the fault of any other member engaged in the common endeavor. That in order to give vitality to this standard of liability, the term "agents" as used in section 1 of the Federal Employers' Liability Act must be given an accommodating scope. As a consequence, the employees of the switching crew of an independent corporation using its own equipment to do the necessary switching incident to the railroad's business in the terminal area and which handles the railroad's trains to further the task of the railroad's enterprise, are agents of the railroad, notwithstanding the corporate autonomy of their employees or their employees' freedom from detailed supervision by the railroad. Accordingly, the railroad is liable for the negligence of the employees of the independent corporation. In *Sinkler* the United States Supreme Court used this specific language:

"We therefore hold that when a railroad employee's injury is caused in whole or in part by the fault of *others performing, under contract, operational activities of his employer,* such others are 'agents' of the employer within the meaning of § 1 of FELA." (Emphasis supplied)

The same rationale is applicable to the instant case. The Dahlman Transfer Business is an independent business performing local pickup and delivery service or less than carload quantities of freight for the railroad. This activity, being a part of the unitary enterprise in which the railroad is engaged, and being part of the operational activities of the railroad, obligates the railroad to bear the burden of all injuries to their own employees arising out of the fault of Dahlman employees engaged in furthering the common enterprise. Accordingly, the Dahlman driver is an "agent" of the defendant railroad under the Federal Employers' Liability Act, rendering his negligence inputable to defendant railroad, and rendering defendant railroad liable for injury to its own employee resulting "in whole or in part" from such negligence.

We find no basis for distinguishing *Sinkler* from the instant case by reason of the fact that there the injury occurred during switching operations in the terminal area, while here the injury occurred during local pickup and delivery service of freight handled by the railroad. The activities here are just as much a part of the unitary enterprise in which the railroad is engaged and as much in furtherance of its operational activities as the other. As such, this amounts to a difference without a distinction and the same rule is equally applicable in both cases.

Defendant railroad argues that the Sinkler case is specifically limited to operational activities of the railroad in rail service, citing the later decisions of Baker v. Texas & Pacific R. Co., 359 U.S. 227, S.Ct. 664, 3 L.Ed.2d 756 and Hetman v. Fruit Growers Express Company, 3 Cir., 346 F.2d 947, in support of its contention. These two cases are not in point. Both involved the question of whether the employees of an independent concern performing services for the railroad under contract were employees of the railroad within the meaning of the Federal Employers' Liability Act entitling them to maintain an action thereunder for their injuries. Both cases held they were not "employees" of the railroad entitled to bring an action for their injuries against the railroad under the Federal Employers' Liability Act. In *Sinkler*, and in the instant case, the question decided is not whether plaintiffs are employees of the railroad under the Federal Employers' Liability Act (both plaintiffs clearly being railroad employees), but whether the railroad is liable to its own employees for injuries resulting from negligence of an independent concern performing operational activities of the railroad. We find nothing in *Baker* or *Hetman* limiting the *Sinkler* holding to rail service alone to the exclusion of the railroad's other operational activities as a common carrier.

Progressing to the second issue, defendant contends the district court committed error in permitting plaintiff to examine Sikonia, the Dahlman driver, as an adverse witness under Rule 43(b) of the Montana Rules of Civil Procedure. Defend-

ant contends that as Sikoniaa is not "an officer, director, employee or agent of a * * * private corporation" under Rule 43(b), plaintiff was not entitled to call Sikonia and examine him as an adverse witness thereunder.

Rule 43(b), M.R.Civ.P. provides that either party may call as an adverse witness "any person who at the time of the happening of the transaction out of which the suit or proceeding grew, was an employee or agent of the opposite party * * *." As Sikonia, the Dahlman driver, was an "agent" of defendant railroad under the Federal Employers' Liability Act, no reasonable basis exists for contending him not to be an agent under Rule 43(b), M.R.Civ.P. An agent is an agent irrespective of the basis of such agency.

Additionally we note that Montana, in adopting Rule 43(b), rejected the limitation contained in Federal Rule 43(b) to *managing* agents, indicating an intention to adopt a better and broader adverse witness rule. See Commission Note to Proposed Rule annotated under Rule 43(b), M.R.Civ.P. Here plaintiff's case depended on establishing Sikonia's negligence which he was not disposed to admit, and permitting plaintiff to examine him by leading questions achieved the purpose behind the adverse witness rule We hold there was no error here.

Directing our attention to the third issue for review, we note that it involves the giving of three jury instructions over the objections of defendant railroad.

The first such instruction was court's instruction No. 21, reading:

"You are instructed that when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are agents of the employer within the meaning of Sec. 1 of the Federal Employers' Liability Act, under which a railroad is liable to an employee injured through the fault of the railroad's

agents. Hence, Frank Sikonia was, for the purpose of this action, an agent of the defendant, and the negligence, if any of the said Frank Sikonia, is imputed to the defendant.''

The defendant's objection to this instruction at the time of settlement was this:

''The defendant objects to the giving of the instruction 12 of the plaintiff, and particularly to the last sentence of that instruction. We do not have any objection to the first part except the last sentence. We think it is a question of fact and not one where it should be made a matter of law. It is a comment on the evidence.''

Defendant contends upon appeal that the question of whether or not Sikonia was an agent of defendant railroad was a factual question that should have been submitted to the jury for determination and not a question of law for the courts. Hence, the instruction that Sikonia was an agent appearing in the last sentence of instruction No. 21 was prejudicial error.

We find defendant's contention to be without merit. The first sentence of the instruction is based on *Sinkler*, heretofore discussed. Under the holding in *Sinkler* the employee of an independent corporation furthering, under contract, the operational activities of the railroad is an agent of the railroad under the Federal Employers' Liability Act. The following admission elicited by plaintiff's attorney at the trial during examination of D. R. Morey, agent of defendant railroad in Butte, is particularly pertinent:

''Q. And Dahlman was furthering the operational activities of the Great Northern Railway Company on February 7, 1968? A. Yes.''

Defendant is bound by this testimony of its own agent and such testimony forecloses any factual issue on the agency of Sikonia, the Dahlman driver Accordingly, court's instruction No. 21 is correct under the evidence in the instant case.

The second and third jury instructions assigned for review will be discussed together. The second instruction was plaintiff's proposed instruction No. 7 which was given as court's instruction No. 14, reading as follows:

"You are instructed that the law of Montana provides:

" 'No person shall start a vehicle which is stopped, or parked unless and until such movement can be made with reasonable safety.' "

Defendant's objection upon settlement was:

"To which the defendant objects on the ground that the instruction is not the fact in this case, the fact showing the vehicle was being moved in an area in an alley which was being used actually as an area where they are moving things, and the record does not support giving this instruction."

The third instruction for review upon appeal is plaintiff's proposed instruction No. 8, given as court's instruction No. 15, which reads as follows:

"You are instructed that the law of Montana provides:

" 'The driver of a vehicle shall not back same unless such movement can be made with reasonable safety and without interfering with other traffic.' "

Defendant's objection upon settlement was:

"Objected to on the same grounds, that the evidence will not support the giving of the instruction. The evidence shows that care was being taken, and it is not supported by the evidence."

Defendant contends upon appeal that these instructions are taken verbatim from two Montana traffic statutes, respectively section 32-2166 and section 32-21-104, R.C.M.1947. Defendant argues these two statutes pertain to the operation of motor vehicles on public streets and highways and not elsewhere, and that in the instant case there is no evidence that the warehouse area where the accident occurred is a public street or highway as defined in he Motor Vehicle Code. Secondly, defendant states

that the giving of the statutes was wrong under the Federal Employers' Liability Act, as negligence thereunder is exclusively a matter of federal law.

Defendant's contentions are erroneous for various reasons. In the first place, the instructions are not reviewable upon appeal because the objections made in the trial court to these two instructions did not cover the objections and contentions now urged upon this appeal. Where, as here, the objection in the trial court is that the evidence will not support the giving of the instruction, the objection must point out wherein the evidence is insufficient in order to preserve such objection for review upon appeal. Rule 51, M.R.Civ.P. The objections to these instructions now being urged upon appeal were never raised in the trial court.

Additionally, the Court can take judicial notice that the area in question is a public street intersecting Montana Street on the east and Washington Street on the west. The instructions, entirely apart from statute, correctly state the standard of care required of drivers of motor vehicles everywhere. See 60A C.J.S. Motor Vehicles § 300, pp. 240, 241 and cases cited therein in footnote 15.

Finally, the law set forth in court's instruction No. 14 and 15 as Montana law, does not significantly vary the duty imposed on the railroad or the duty of those with whose conduct the railroad is chargeable. Conceding that federal law controls in Federal Employers' Liability Act cases and that state laws to the contrary must yield (Chesapeake & Ohio Railway Company v. Stapleton, 279 U.S. 587, 49 S.Ct. 442, 73 L.Ed. 861; Davee v. Southern Pacific Company, 58 Cal.2d 572, 25 Cal.Rptr. 445, 375 P.2d 293), in the instant case there is no contrariety between federal and state law as applied to the two jury instructions here. The instructions are merely statements of the common law generally.

For the foregoing reasons, defendant's contentions respecting the three jury instructions are without merit.

The final issue for review concerns whether the verdict is excessive, appearing to have been given under passion or predudice, and whether it is against the law as given in the court's instructions. This issue is entirely confined to the amount of damages awarded by the jury in its verdict, which in this case was $125,000.

In our view of this issue we need not concern ourselves with whether this Court in the instant case has the power to reduce the excess in the verdict and order remittitur accordingly or only the power to grant a new trial. We will concern ourselves only with whether a new trial should be ordered.

Following judgment here, defendant moved for a new trial under section 93-5603, subsections 5 and 6. That statute provides in material parts:

"The former verdict or other devicision may be vacated and a new trial granted, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party:

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"(5) Excessive damages, appearing to have been given under the influence of passion or prejudice;

"(6) Insufficiency of the evidence to justify the verdict or other decisions, or that it is against law;  \*  \*  \*".

The instructions to the jury become the law of the case and binding upon the jury, and a verdict contrary thereto is a verdict contrary to law which justifies a new trial. Lynes v. Northern Pacific Ry. Co., 43 Mont. 317, 117 P. 81; Bush v. Baker, 51 Mont. 326, 152 P. 750. Applying this principle to the instant case, defendant railroad contends that the verdict here is contrary to the jury instructions and therefore against the law. Defendant reaches this conclusion on the basis that there is no evidentiary justification for any past and future wage loss exceeding $18,471; that the jury did not consider plaintiff's con-

28

tributory negligence in diminution of damages; and, that the size of the verdict under the evidence demonstrates an excessive verdict given on the basis of passion and prejudice.

Under the evidence in the instant case, it is clear that plaintiff received a substantial injury, permanent in character, and totally disabling to date, except for a brief period when plaintiff attempted to work but was unable to continue. Under the instructions of the district court, the jury was entitled to consider as elements of damages (1) past and future medical and hospital expense; (2) past and future pain and suffering; (3) past and future loss of wages; (4) impairment of plaintiff's earning capacity; and (5) disfigurement. The jury instructions on damages are not claimed to be an incorrect statement of the law.

Defendant contends there is no evidentiary basis for the award of any amount exceeding $18,471 for past and future wage loss. In our view this contention does not take into account loss of future earning capacity as an item of damages distinct from loss of earnings. Plaintiff is entitled to recover for loss of future earning capacity as an element of damages. Putman v. Pollei, 153 Mont. 406, 457 P.2d 776; Thomas v. Whiteside, 148 Mont. 390, 421 P.2d 453, 148 Mont. 394, 421 P.2d 449.

Here there is substantial credible evidence that plaintiff suffered a substantial loss of future earning capacity by reason of his injury. He had an established earning power at the time of injury of $24.42 per day for an 8 hour day, 40 hours per week, which had increased at the time of trial to $26.20 per day on the same basis. Plaintiff had an established seniority in his job. His job involved essentially manual labor. Defendant's agent admitted plaintiff was not qualified to handle office jobs not requiring manual labor, so if he were to continue with the Great Northern Railroad Company in his seniority, it would have to be as a manual laborer. The evidence shows that plaintiff had only an 8th grade education. Testimony indicated that plaintiff at the time of trial (about 18 months after the injury) was still totally disabled from working; that

his injury had not healed despite both conservative treatment and surgery; that further surgery probably will be required, and plaintiff's injury may not heal then. Although the testimony admits of contrary conclusions as to the permanence of the injury and loss of earnings, defendant's own doctor tacitly acknowledged the situation in these words:

"*If and when* Mr. Salvail gets a solid fusion of the four bones that have been operated on, he should be able to return to his regular work, should be able to walk on level floors as well as rough floors, and to do this type of work." (Emphasis added.)

The surgery involved is strictly salvage work for the purpose of surgical improvement in the condition of the injured foot. The surgery consisted of a triple arthrodesis which is an attempted surgical fusion of four bones and three joints into one bone for the purpose of reducing mobility in the foot and decreasing pain. It is clear that plaintiff has sustained a permanent injury here.

What will happen in the future concerning restoration of plaintiff's earning capacity is, of course, to a degree uncertain. Whether plaintiff's existing loss of earning capacity will be eliminated in the future by surgical salvage procedures is uncertain. Plaintiff's medical witness, Dr. Kelly, who operated on plaintiff, had this to say:

"Q. These residual physical impairments you have mentioned, lack of motion and pain on walking on rough ground, and so forth, these are conditions or injuries that will persist in the future? A. He may improve some, I am sure he will. He might possibly have to have further surgery on the mid-tarsal joints. I don't think he will. I don't think one should take odds or guess. He might have to have this. I think with time, perhaps in six months he will reach a base line of being able to do things. This will be either with or without further surgery. If he does have motion in the arthrodesis, it is not as solid as expected and hoped it would be, then as far as the mid-tarsal he will have pain until those joints are obliterated. He has this

problem with swelling which is tied up with the original injury,. and he also has the problem of compensating for whatever residual he has.

"Q. If I understand by the base line reference you made, in. six months—A. About where is he going to be.

"Q. In six months he will achieve maximum healing? A.. That's what I am trying to say.

"Q. But he won't be better off then? A. He might be some,. now that's hard to say, but I don't think he will be a great deal better off than he is now, I am afraid."

This testimony, together with Dr. Kelly's other testimony that plaintiff was disabled and unable to perform manual labor connected with his job, furnishes a basis for a jury finding that plaintiff's actual loss of earning capacity at the time of trial would remain substantially unchanged. Plaintiff is a 38 year old man with a life expectancy of 37.96 years. His earnings in the year prior to injury were $6,121.77 Surely there is an evidentiary basis for a substantial award here.

Defendant also complains that the jury did not consider plaintiff's contributory negligence in diminution of damages. The basis for this contention escapes us. A general verdict being returned without interrogatories or answers, there is no way to tell what the jury decided with reference to contributory negligence. Certainly, contributory negligence was not established as a matter of law and the jury may well have found no contributory negligence by plaintiff. There is simply no substantiation in the record here for defendant's conclusion that the jury did not consider this matter under the instructions. of the court.

Finally defendant argues that the verdict is excessive and appears to have been rendered on the basis of passion and prejudice. We disagree. Here there was substantial credible evidence of past pain and suffering by plaintiff from his injuries over an 18 month period prior to trial, and at least arguable evidence that any change in this situation was unlikely. Plaintiff

had incurred medical .and hospital expense up to the time of trial in the total amount of $1,921, of which $939.45 is owed by plaintiff. Future surgery is indicated. He has lost earnings up to the time of trial of approximately $15,000. His established earning capacity at the time of injury was totally impaired at the time of trial and there is arguable evidence that this will not substantially change in the future. This item alone would justify an award exceeding $100,000. Additionally, plaintiff is entitled to damages for past and future pain and suffering from his injury. The jury was instructed that they could return a verdict not exceeding $164,112.99. This instruction has not been assigned as error upon appeal.

It is idle to cite cases from this or other jurisdictions on awards by juries for certain injuries as no two cases are alike and each case turns on its own facts. In 11 A.L.R.3d there are 713 pages of cases for comparison.

The amount to be awarded as damages is properly left to the jury and this Court will not substitute its judgment for that of the jury particularly where, as here, the trial court has approved the verdict by denying a new trial. Strong v. Williams, 154 Mont. 65, 460 P.2d 90. It is only where the amount awarded is so grossly out of proportion to the injury as to shock the conscience that this Court will intervene. In the instant case the verdict of $125,000 is not so grossly out of proportion to the injury as to shock our conscience nor induce a belief that it was the product of passion or prejudice. There is nothing whatsoever in the record to indicate passion or prejudice; on the contrary, there is a substantial evidentiary basis justifying the amount of the award.

The judgment of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES CASTLES, DALY and JOHN C. HARRISON, concur.